**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**YAMILL VEGA,**

                Plaintiff,

    -against-

**THE CITY OF NEW YORK,**
**CORRECTION OFFICER HEHL,**
**CAPTAIN BOODOO, CAPTAIN**
**MALCOLM, CORRECTION OFFICER**
**DOES #1-2,**

              Defendants.

Case No.:

**COMPLAINT**

Plaintiff YAMILL VEGA, by his attorneys, Rickner PLLC, complaining of the Defendants, alleges, upon information and belief and personal knowledge:

## NATURE OF THE CASE

1. Plaintiff YAMILL VEGA ("Plaintiff" or "Mr. Vega") brings this action for compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for violations of his federal and state constitutional rights while in the custody of the New York City Department of Corrections at Rikers Island.

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, Plaintiff's rights under Article 1 of the Constitution of the State of New York, and the common laws of the State and New York.

3. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

4. Pursuant to New York State General Municipal Law § 50-e, Plaintiff filed a timely Notice of Claim with the New York City Comptroller, and the Comptroller designated the claim

1

as number 2022PI019057 and 2022PI021998.

5.      Plaintiff appeared for a hearing under New York State General Municipal Law §

50-h on September 21, 2022 and January 18, 2023, respectively.

6.      Plaintiff's claims were not adjusted by the New York City Comptroller's Office

within the period of time provided by statute.

## VENUE

7.      Venue is properly laid in the District Court for the Southern District of New York,

because the Plaintiff's claims arose in Bronx County.

## JURY DEMAND

8.      Plaintiff hereby demands a trial by jury.

## PARTIES

9.      Plaintiff was at all times relevant to this action a resident of Bronx County and is

currently a resident of Ulster County in the State of New York.

10.     Defendant the City of New York ("the City") is a municipal entity created and

authorized under the laws of the State of New York.

11.     It is authorized by law to maintain a municipal jail system and does so through the

New York City Department of Correction ("DOC"), which is responsible for the operation and

maintenance of the multi-facility complexes located on Riker's Island.

12.     Correction Officer Hehl (hereinafter "Defendant Hehl") was at all relevant times

described herein an employee of the DOC, employed by the City of New York. At all relevant

times described herein he was acting under color of New York state law and acting in the course

and scope of the duties attendant to that employment. He is sued in an individual capacity.

Defendant Hehl is entitled to indemnification by the City of New York under New York law for

any liability arising from his conduct described herein.

2

13.     Captain Boodoo (hereinafter "Defendant Boodoo") was at all relevant times described herein an employee of the DOC, employed by the City of New York. At all relevant times described herein he was acting under color of New York state law and acting in the course and scope of the duties attendant to that employment. He is sued in an individual capacity. Defendant Boodoo is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

14.     Captain Malcolm (hereinafter "Defendant Malcolm") was at all relevant times described herein an employee of the DOC, employed by the City of New York. Defendant Malcolm is believed to be a security captain who is black and approximately six feet four inches tall. At all relevant times described herein he was acting under color of New York state law and acting in the course and scope of the duties attendant to that employment. He is sued in an individual capacity. Defendant Malcolm is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

15.     Correction Officer Doe #1 (hereinafter "Doe #1") was at all relevant times described herein an employee of the DOC, employed by the City of New York. Defendant Doe #1 is the CO who was in the hallway outside of the day room of Four Lower North, RNDC, during Plaintiff's assault on April 4, 2022 and is believed to be a dark skinned, chubby man with glasses and approximately five foot six inches tall. At all relevant times described herein he was acting under color of New York state law and acting in the course and scope of the duties attendant to that employment. He is sued in an individual capacity.

16.     The true name and shield number of Defendant Doe #1 is not currently known to the Plaintiff. However, he is an employee or agent of DOC. Accordingly, he is entitled to representation in this action by the New York City Law Department ("Law Department") upon

their request, pursuant to New York State General Municipal Law§ 50-k. The Law Department, then, is hereby put on notice (a) that Plaintiff intends to name said officer as a defendant in an amended pleading once the true name and shield number is known and (b) that the Law Department should immediately begin preparing Defendant Doe 1's defense in this action.

17.    Correction Officer Doe #2 (hereinafter "Doe #2") was at all relevant times described herein an employee of the DOC, employed by the City of New York. Defendant Doe #2 is the CO who was in the bubble in Four Lower North, RNDC, during Plaintiff's assault on April 4, 2022 At all relevant times described herein he was acting under color of New York state law and acting in the course and scope of the duties attendant to that employment. He is sued in an individual capacity.

18.    The true name and shield number of Defendant Doe #2 is not currently known to the Plaintiff. However, he is an employee or agent of DOC. Accordingly, he is entitled to representation in this action by the Law Department upon their request, pursuant to New York State General Municipal Law§ 50-k. The Law Department, then, is hereby put on notice (a) that Plaintiff intends to name said officer as a defendant in an amended pleading once the true name and shield number is known and (b) that the Law Department should immediately begin preparing Defendant Doe 2's defense in this action.

19.    Collectively Defendants Hehl, Boodoo, Malcolm, and Does #1-2 are referred to as the "Individual Defendants."

20.    At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees of DOC and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for, and on behalf of, DOC at all

times relevant herein, with the power and authority vested in them as officers, agents and employees of DOC and incidental to the lawful pursuit of their duties as officers, employees and agents of the DOC.

21.     At all relevant times, the Individual Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

22.     Defendant the City of New York assumes the risks incidental to the maintenance of Rikers Island and the employment of its staff and corrections officers.

### THE VIOLATION OF PLAINTIFF'S CIVIL RIGHTS

*Plaintiff's First Few Months on Rikers*

23.     From the moment Mr. Vega entered Rikers Island in mid-February 2022, when he was only 21 years old, he was subjected to unconstitutional, deplorable, and inhumane conditions.

24.     Mr. Vega is only five foot eight and weighs 145 pounds, making him particularly vulnerable to the psychological and physical abuse of Rikers.

25.     He was initially placed in Two Lower South at the Robert N. Davoren Complex ("RNDC"), where he was not fed for two weeks.

26.     During his two months in Two Lower South, Mr. Vega was under almost constant assault by other incarcerated individuals, as Two Lower South was a "gang house," where the majority of individuals housed there belonged to the Bloods.

27.     In total, Mr. Vega was assaulted approximately 4-5 times and consistently bruised all over his face and body. Each time he requested medical attention, it took almost a week for him to be seen by a doctor.

28.     He reported these assaults to Individual Defendants Boodoo and Malcolm and asked to be transferred to a non-gang house. The Individual Defendants, however, forced Mr. Vega to sign a statement that he felt safe in Two Lower South so they would not have to move him.

29.     It was not until Mr. Vega was beaten in his cell in March 2022 that Boodoo and Malcolm were forced to transfer him to a new housing unit. The cell doors in Two Lower South did not lock properly and could be manually opened, leading to Mr. Vega's assault and his having many personal items stolen.

***The April 4, 2022 Incident***

30.     After the assault in his cell, Mr. Vega was transferred to Four North Lower in RNDC, which he was told was a "neutral house," or not affiliated with any gangs.

31.     Within 24 hours, Mr. Vega noticed incarcerated individuals walking around with black scalpels and ice picks made from hotpot plexiplastic and knew the house was not neutral. In fact, Four North Lower was a gang house run by the Trinitarios.

32.     On or around April 2, 2022, he asked Defendant Malcolm to transfer him out and was again forced to sign a false statement that he felt safe.

33.     On April 4, 2022, between 2:45-3:00 p.m., Mr. Vega was walking towards the dayroom to use the phone. Another incarcerated individual who was also not gang affiliated and had been transferred from Two Lower South, Elijah Carr, joined him.

34.     In the dayroom were a total of nine incarcerated individuals: Mr. Vega was talking with his mother on the phone, two other incarcerated individuals were using other phones, Mr. Carr was near the TV, and there were approximately 5-7 incarcerated individuals known to be Trinitarios. There was one Correction Officer ("CO") on the floor outside of the dayroom and one in the bubble.

35.     Within a few minutes, the Trinitarios began to beat the two incarcerated individuals on the phones. These two men, scared for their lives, fled the dayroom, and slammed the doors behind them, leaving Mr. Vega and Mr. Carr trapped with the Trinitarios, who were each holding an ice pick.

36.     The Trinitarios came at Mr. Vega and Mr. Carr with their weapons raised, commenting about how the men did not want to join the gang—prior to this encounter, Mr. Vega was approached about joining the gang, but had declined.

37.     Mr. Vega and Mr. Carr ran towards the door and banged on it to be let out while the Trinitarios proceeded to stab them repeatedly. In total, Mr. Vega was stabbed approximately 10-15 times in the head, shoulder, and back.

38.     While Mr. Vega and Mr. Carr were being stabbed, the two incarcerated individuals who had first been attacked and fled were banging on the doors and yelling at the CO in the bubble to buzz them open.

39.     Several minutes later, the CO buzzed the doors and the two incarcerated individuals dragged Mr. Vega and Mr. Carr off the floor as they were being stabbed and slammed the doors closed with the Trinitarios inside. The CO on the floor remained stoic during the attack and did absolutely nothing to assist in Mr. Vega's rescue.

40.     A Captain and CO handcuffed Mr. Vega, took photos of his injuries, and walked him to West Facility for medical attention. After he was patched up, he was taken to Five Main, which he was told was protective custody, which was false.

41.     Several days later, he was transferred to the Vernon C. Bain Center ("VRBC"). While there, Mr. Vega sought mental health treatment and began taking anti-depressants for the first time in his life.

*The May 4, 2022 Incident*

42.     On May 4, 2022, Mr. Vega and about thirteen other incarcerated individuals, including Mr. Carr, were transported to Bronx Criminal Court for their respective court appearances.

43.     The group was supposed to head back to VCBC around 3:00 p.m., but did not leave until sometime after 7:00 p.m., when Defendant Hehl arrived. The incarcerated individuals let Hehl know they were upset about his tardiness; on the ride back, Mr. Carr made a few comments to Hehl.

44.     When the bus arrived back at VCBC, Hehl told Mr. Carr and Mr. Vega, who were handcuffed to one another in the cage directly behind the driver's seat, that they would remain on the bus. Hehl told them he was going to "teach [them] something." They remained on the bus for several minutes while the rest of the incarcerated individuals exited.

45.     Once the COs inside VCBC radioed Hehl asking about Mr. Vega and Mr. Carr, he unlocked the cage and pushed Mr. Vega, causing him to fall into Mr. Carr, who then fell on the bus stairs. Mr. Vega ended up falling backwards and landing on his neck and back.

46.     Both men got up and continued walking, as directed by Hehl, towards VCBC.

47.     Hehl kept stepping in front of them and pushing them both in the chest, stating "you guys are walking too fast." This happened approximately 3-4 times until a female CO told Hehl to leave them alone.

48.     Once in the search room, Hehl told them to strip and several other COs came in and started threatening them, yelling "do you want to fight?" in their faces. Mr. Vega began screaming for the captain, who luckily came and demanded that Hehl leave.

49.     Mr. Vega was sent to his cell and several hours later went to medical for his neck and back—he was given ibuprofen and was not x-rayed despite his requests. Mr. Vega went back

to medical the next day, and although he reported an 8/10 on the pain scale, he was merely given ibuprofen again.

***Overall Conditions on Rikers Island***

50.     For the entirety of Mr. Vega's time on Rikers Island, he lived in dilapidated and unsanitary conditions, was surrounded by violence, and was not provided adequate services.

51.     Rikers Island has a plethora of structural and physical problems, including lack of adequate heat and dilapidation.

52.     Furthermore, Mr. Vega often did not receive adequate, sanitary, and regular meals and was almost rarely, if ever, given recreational time.

53.     Mr. Vega also consistently received inadequate medical care while on Rikers Island. As explained in more detailed under Plaintiff's Third Claim for Relief, in *Agnew v. New York City Dept. of Correction*, Bronx Supreme Court issued an Order on December 3, 2021, requiring DOC to immediately comply with its legal duties to provide medical services by:

a) Providing all class members with access to sick call on weekdays and make sick call available a minimum of five days per week within 24 hours of a request;
b) Providing sufficient security to allow class members movement to and from health services in the jails; and,
c) Not prohibiting or delaying class members' access to care, appropriate treatment, or medical or dental services.

2021 WL 6104121, at *2 (Sup. Ct. Bronx Cty. 2021).

54.     During his stay at Rikers, Mr. Vega missed approximately 19 appointments due to DOC's failure to produce him.[1]

---

[1] (All dates were in 2022) Missed Sick Visits on 3/14, 3/15, 3/21, and 3/22; Missed Sick Call Visit on 3/22; Missed Social Work Visit on 3/17; Missed Mental Health Visits on 2/26, 3/1, 3/10, 3/18, 3/21, and 3/22; Missed Dental Visits on 3/28, 4/18, and 5/4; Missed Physical Therapy Visit – 4/28; Missed PsychMeds Visit on 6/6, 5/30, and 5/17.

55.     More than half of these appointments were related to his mental health, which Mr. Vega struggled with for the first time in his life once he came to Rikers Island. In less than two weeks of arrival, on February 24, 2022, Mr. Vega requested to go to medical because his anxiety since being incarcerated was making it hard for him to sleep, among other things.

56.     He was not taken in for an initial mental health assessment until March 11, 2022.

**THE INJURIES TO PLAINTIFF**

57.     This action seeks damages on behalf of Plaintiff for the extraordinary emotional pain and suffering and injuries to his person, that he was forced to endure as a consequence of the Individual Defendants' decidedly wrongful actions.

58.     The Individual Defendants' actions were wanton, reckless, and malicious, as well as in blatant disregard of Plaintiff's civil rights, and as such the Individual Defendants are liable for punitive damages, as is the City of New York under the doctrine of *respondeat superior*.

59.     All of the causes of action pleaded herein fall within one or more of the exceptions set forth in New York's Civil Practice Law & Rules 1602 with respect to joint and several liability.

**FIRST CLAIM FOR RELIEF:**
**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

60.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

61.     Individual Defendant Hehl used unconstitutional physical force against Plaintiff.

62.     Individual Defendant Hehl engaged in the use of force that was excessive, malicious, gratuitous, and with the intention of inflicting physical and emotional harm to Plaintiff.

63.     That by virtue of the aforementioned acts by Defendant Hehl, Plaintiff was deprived civil rights guaranteed under the Fourth Amendment to the United States Constitution to be free

from unreasonable or unlawful searches and seizures, and Defendant Hehl is therefore liable to Plaintiff for damages under 42 U.S.C. § 1983.

64.    As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries.

65.    As a result of the above unconstitutional conduct, Defendant Hehl is liable for punitive damages.

**SECOND CLAIM FOR RELIEF:**
**DELIBERATE INDIFFERENCE UNDER 42 U.S.C. § 1983**
**AGAINST THE INDIVIDUAL DEFENDANTS**

66.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

67.    Individual Defendants Malcolm, Boodoo, Doe #1, and Doe #2 failed to prevent substantial bodily harm to Plaintiff despite knowing that a risk of serious harm existed. Plaintiff told Defendants Malcolm and Boodoo of said risk and they consciously disregarded him despite having opportunities to prevent the harm. Defendants Doe #1 and Doe #2 failed to act in an objectively reasonable way and without substantial delay to prevent and/or stop Plaintiff from experiencing serious bodily harm.

68.    Individual Defendants Malcolm, Boodoo, Doe #1, and Doe #2 failed thereby displayed deliberate indifference to Plaintiffs rights, including Plaintiffs right to be free from unreasonable and substantial bodily injury.

69.    The Individual Defendants also agreed among themselves and with other individuals to act in concert and thus conspired to deprive Plaintiff of clearly established civil rights.

70.     That by virtue of the aforementioned acts by Individual Defendants Malcolm, Boodoo, Doe #1, and Doe #2, Plaintiff was deprived of civil rights guaranteed under the Constitution of the United States, and the Individual Defendants therefore are liable to Plaintiff for damages under 42 USC § 1983.

71.     As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical and emotional injuries.

72.     As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

### THIRD CLAIM FOR RELIEF:
### *MONELL* CLAIMS AGAINST THE CITY OF NEW YORK

73.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

74.     The City of New York is liable for the conduct of DOC and its employees on Rikers Island under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

75.      The City has had de facto policies of understaffing on Rikers Island, failing to hire and train correction officers, failing to properly manage correction officers and staff at Rikers Island, and failing to keep Rikers Island's facilities in proper working order.

76.     The City, including the final policy makers at DOC and the mayor himself, have been aware of problems like those in this Complaint, which have consistently gotten worse since the beginning of the COVID-19 pandemic. Rikers Island continues to deteriorate, and although the final policymakers have known this, they have chosen to do nothing to slow or stop it.

77.     This is not a case where a single incident caused the civil rights violation, although often that is the case. Instead, there are a collection of horrible conditions that have worked in concert to make Rikers Island unbearable, unconstitutional, and inhumane. These conditions,

moreover, have not occurred in isolated facilities or at isolated times. The problem is system wide.

78.     In a case challenging numerous conditions of confinement, the Second Circuit made clear that "[e]ach of these conditions must be measured by its severity and duration, not the resulting injury, and none of these conditions is subject to a bright-line durational or severity threshold. Moreover, the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another."[2]

79.     The numerous deplorable conditions on Rikers Island add up to create an overall environment that deprives every person incarcerated there of their basic constitutional rights.

80.     Through its deliberate indifference to the horrible conditions on Rikers Island and its failure to address numerous problems there despite being aware of them for many years, the City has violated Plaintiff's rights and caused injury.

### A. Conditions are overcrowded, unsanitary, and unhabitable as the physical structures on Rikers Island fall apart.

81.     Overcrowding is rampant in the Rikers jail complex, jail cells are not habitable or sanitary, and infrastructure is falling apart.

82.     In intake, rather than spending a few hours in the small cells where new detained persons are processed, dozens of people are stuffed into small cages for days and weeks at a time. Shockingly, they are expected to defecate and urinate in plastic bags within inches of one another.[3]

83.     The New York Post published images which "show as many as 26 men stuffed body to body in single cells where they were forced to relieve themselves inside plastic bags and

---

[2] *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017).
[3] *See* Open Letter to New York City District Attorneys (October 5, 2021), https://secureservercdn.net/50.62.89.79/egs.840.myftpupload.com/wp-content/uploads/2021/10/DA-open-letter-Final.pdf.

take turns sleeping on the fetid floors."[4]

84.     During a five-day period in mid-September, at least 105 detained persons were inside the crowded cells long after they should have been moved, records show.[5]

85.     In April 2021, a group of detained people was brought to intake where they were forced to stay with 27 other people in a single holding pen for three days. At least six of the detained persons in the cell were throwing up, likely suffering from drug withdrawal, before the detained persons were moved into the permanent housing area.

86.     One of the men, Mr. Thomas Earl Braunson III, who was being held on a minor parole violation, died hours later; his death is currently under investigation. DOC staff did not clean the area in which the man had passed away, despite it being covered in feces and blood. Other detained persons in the unit were forced to clean the mess without any protective equipment.

87.     The Board of Correction's ("BOC") internal investigation of Mr. Braunson's death noted "horrible conditions" in the jail's intake area where the detained persons were held, reporting that the area has "severe staffing shortages and supplies issues . . . [including] missing sheets and blankets," that no one in the entire facility had a pillow, and that the detained persons "were not receiving recreation or meals on a regular schedule."[6]

88.     Some detained persons go two to four weeks without being offered a shower or clean clothing, and others are forced to sleep on the ground, shoulder to shoulder in these cells. Clothing and shoes, such as slippers typically used in the showers, are altogether unavailable,

---

[4] *See* Gavrielle Fonrouge, *Photos Inside Rikers Island Expose Hellish, Deadly Conditions*, New York Post (Oct. 21, 2021), https://nypost.com/2021/10/21/photos-inside-rikers-island-expose-hellish-deadly-conditions/.
[5] *Id.*
[6] *See* NYC BOC Death Reviews: Preliminary Report to Board on the death of Thomas Braunson, prepared by Dep. Gen. Counsel Kate McMahon (Apr. 23, 2021), https://s3.documentcloud.org/documents/21031127/preliminary-board-report-thomas-braunson_redacted-1.pdf.

leaving detained persons vulnerable to slip and falls or foot infections from the shared shower spaces and general filth accumulating in the unattended facilities.

89.     Vermin, bugs, and roaches are also widespread throughout Rikers facilities, and have been for years,[7] including in the kitchens, bathrooms, and sleeping areas.

90.     Lawmakers who toured the facility in 2021 reported shower stalls doubling as cells, garbage covering the halls, fecal matter, urine, and dead cockroaches on the floor.[8]

91.     During a visit to Rikers in February 2022, a court-appointed monitoring team "found the conditions at one intake to be particularly distressing—a toilet was overflowing with feces and an individual was sleeping on the floor outside one of the intake pens."[9]

### i.  Lack of Sanitation

92.     Rikers Island is built on an old landfill, creating a number of hazardous environmental conditions from its inception.[10] The City is aware of these unsafe conditions but, with deliberate indifference, has failed to provide proper sanitation on the Island.

93.     In 2001, the District Court for the Southern District of New York issued an order (the "Environmental Order") directing the DOC to take specific actions to remedy violations of federal law in fourteen New York City jails, including those on Rikers Island.[11] The *Benjamin*

---

[7] *See* Sam Ball , "Tales From Inside Rikers, The Notorious NYC Jail Set To Close," France 24, https://www.france24.com/en/20180226-tales-inside-rikers-island-notorious-new-york-jail-prison-close

[8] Graham Rayman and John Annese, "'Horror Island': NYC politicians touring Rikers witness filth, overcrowding and inmate's attempted suicide," New York Daily News (Sept. 13, 2021), https://www.nydailynews.com/new-york/nyc-crime/ny-pols-tour-rikers-island-decry-conditions-20210914-c7tkloonubhmzidc4y3mndbtbq-story.html

[9] *See* Special Report of the *Nunez* Independent Monitor at 23, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.

[10] Ashley Gilbertson, "This is Rikers," The Marshall Project (June 25, 2015), https://www.themarshallproject.org/2015/06/28/this-is-rikers.

[11] *See Benjamin v. Brann*, Case No. 1:75-cv-03073 (LAP) (S.D.N.Y.).

class action involves years of court-ordered reform and mandatory reporting regarding the progress of the environmental conditions in the City's jails. But over two decades later, conditions have worsened, and the most recent reports from the Office of Compliance Consultants ("OCC") concerning the Environmental Order paint a bleak picture of conditions on the Island.

94.     In a quarterly progress report covering the period between January and April of 2019, a year before the pandemic hit New York City, 29 housing areas failed their inspections with respect to the management of basic sanitation and housekeeping in the facilities.[12] In 25 percent of those cases, the DOC provided inadequate cleaning equipment, while only 2 percent were found to follow proper cleaning procedures.[13]

95.     During the same four-month period, there were approximately 250 incidents of vermin reported by DOC staff, including the presence of flies, ants, maggots, roaches, mice, and rats in the facilities.[14]

96.     The status report in *Benjamin* covering May–August of the following year, 2020, found that the DOC was still not "in substantial compliance with the Court's sanitation mandates" and that there was "no improvement" concerning sanitation from the prior monitoring period.[15] In nearly every facility that was checked during this period, mildew or pooling water was found on and inside the walls and floors of the bathroom areas.[16]

97.     A year later, the report covering May–August of 2021 stated that there were significant discrepancies between the reporting by the City's agencies and their own observations

---

[12] Austin-Best, Nicole N., "Report on Environmental Conditions: January–April 2019," Office of Compliance Consultants, at 5 (June 17, 2019).
[13] *Id.*
[14] *Id.* at 10.
[15] *See* Austin-Best, Nicole N., "Report on Environmental Conditions: May–August 2020," Office of Compliance Consultants, at 4–5 (Oct. 15, 2020).
[16] *Id.* at 20.

of the environmental conditions of the City's jails.[17]

98.     The 2021 report also found a "clear decline" in the City's compliance over the course of the prior year.[18] While the report indicated that there was a "widely known" issue of "significant staff shortages," during this period, the City failed to discuss with the monitor what effect those shortages were having on compliance with the Environmental Order.[19]

| Monitoring Period | January–April 2020 | May–August 2020 | September–December 2020 | January–April 2021 | May–August 2021 |
|---|---|---|---|---|---|
| Number of Inspections | 130 | 168 | 161 | 169 | 141 |
| Compliance Percentage | 62% | 76% | 78% | 69% | 61% |

99.     These reports demonstrate what those housed on Rikers have long reported—conditions are filthy, unsanitary, and uninhabitable. And they are only getting worse.

### ii. Heat Conditions

100.    Rikers Island was once described by a detainee as smelling like "sewer, mixed with fertilizer, mixed with death," conditions which significantly worsen with extreme temperatures.[20]

101.    Heat waves at Rikers have been especially prevalent in the summer months.[21] In the summer of 2020, at least 89 percent of grievances made to the DOC were related to a lack of operative air conditioning units or fans in the unit and a lack of access to cool showers, all in the

---

[17] *See* Austin-Best, Nicole N., "Report on Environmental Conditions: May–August 2021," Office of Compliance Consultants, at 6 (Oct. 27, 2021).
[18] *Id.* at 6–7.
[19] *Id.* at 7.
[20] *See* Raven Rakia, "A Sinking Jail: The Environmental Disaster That Is Rikers Island," Grist (March 15, 2016), https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island/.
[21] Liz Donovan, "As Conditions at Rikers Reach Crisis Levels, Concerns About Heat Persist," CityLimits.org (Sept. 13, 2021), https://citylimits.org/2021/09/13/as-conditions-at-rikers-reach-crisis-levels-concerns-about-heat-persist/

midst of record-breaking temperatures.[22]

102.    None of the jail facilities on Rikers Island are fully air conditioned, and six of the ten jails on Rikers Island have no air conditioning.[23] Where air conditioners are present, the units regularly break, turning dorms into sweatboxes within minutes.[24]

103.    The City is aware of the heat conditions on Rikers Island and has the resources to provide temperature control in the facilities but has failed to do so.

### iii. Structural and Physical Problems

104.    Structural deterioration is another long-standing issue on the Island, as the City has ceased any meaningful maintenance of the grounds in anticipation of closing Rikers altogether. The Island is filled with decaying and dilapidated structures never meant to provide permanent facilities, including trailers, tents, and the infamous VCBC barge, which was docked for temporary use as an "emergency fix" for the Island in 1992. Almost three decades later, VCBC remains an active housing unit for detained persons.

105.    In 2017, Mayor DeBlasio acknowledged that extensive repairs and renovations the buildings on Rikers Island were necessary, but the administration seemed to focus on closing Rikers rather than improving conditions for those currently housed there.

106.    During the City's most recent hurricane, flooding and old roofing caused the ceiling in one of the dorm areas came crashing down onto the head of a sleeping detainee. Two weeks later, the mess from the collapse remained strewn about the dorm, and the injured detainee had not been seen by the medical staff. Detained persons were told by the few staff members present to stay away from the wreckage but were nonetheless expected to sleep under the collapsing ceiling.

---

[22] *Id.*
[23] Raven, *supra* n.23.
[24] Donovan, *supra* n.24.

107.    The structural deterioration at Rikers contributes to the physical and mental deterioration of incarcerated people. One detainee attributed numerous suicide attempts to the "complete isolation, extreme temperatures, polluted air, [and] the stink of the landfill" that is the ever-present reality of being incarcerated at Rikers.[25] This physical and mental deterioration is exacerbated by the lack of emergency and preventative care resulting from staffing shortages.

108.    The City's deliberate indifference to structural deterioration has persisted for years, leaving past, present, and future detainees vulnerable to illness, injury, and/or death.

109.    The City's own investigation in 2015 found scores of "'raw materials to fashion weapons,' with buildings full of aging pipes, metal radiators and other items that could be broken, beaten or carved into crude blades."[26] One detainee recently discovered that a metal grate in the wall of his cell was deteriorated so significantly that he was able to easily kick it down, climb out, and stab his neighbor.

110.    Nevertheless, only minimal efforts have been made to repair the Island's structures and create habitable conditions for the detained persons; efforts which have all but disappeared in the wake of the City's plan to close Rikers.

111.    The structural deterioration at Rikers must be analyzed in combination with other conditions. Inoperable air conditioning units, flooding, clogged and broken plumping, aging materials, air pollution – these structural deficiencies leave detainees vulnerable to physical and mental illness, as well as increased levels of violence.

112.    When people incarcerated at Rikers are forced to remain in these deteriorating conditions and in crowded, unsanitary, uninhabitable cells, the overall environment created results

---

[25] Raven, *supra* n.23.
[26] *Supra* n.14.

in gross rights violations.

113.    The conditions leave detainees vulnerable to illnesses like COVID-19 and legionnaires disease. Again, these conditions reinforce each other: the crowded and unsanitary conditions lead to rampant illness, left untreated because of staffing shortages and general mismanagement of facilities and services.

114.    Crowded, unsanitary, and uninhabitable conditions are pervasive throughout all facilities and experienced in one form or another by all people incarcerated at Rikers.

**B.  Detained persons are denied adequate, sanitary, and regular meals.**

115.    On top of living in these overcrowded, filthy conditions, individuals housed on Rikers Island are not receiving their meals on a regular schedule and the City has been deliberately indifferent to this problem even as it continues. The lack of adequate, sanitary, and regular meals is experienced by essentially every person on the Island, regardless of housing placement, as staff absenteeism has hampered the regular preparation and distribution of meals.

116.    When food is finally served, sometimes hours late, it is often cold and unsubstantial. As a result, basic dietary needs are not being met, particularly for those with prescription diets due to underlying medical issues such as diabetes or heart disease.

117.    In crowded intake areas, officers simply throw loaves of bread into the cells, leaving those packed inside to fend for themselves and fight over the limited amount of available food.

118.    The DOC also orders and stocks its meals based on the maximum capacity of a given dorm or housing area. Because entire units are not being utilized due to a lack of available staff, detained persons are being forced into a few dormitories, far beyond capacity, but meals remain limited to the number of persons who *should* be housed in one area.

119.    Incarcerated persons are thus forced to split meals and utilize commissary to meet

their necessarily calorie intake, and gangs have taken it upon themselves to distribute food inequitably, leaving some detained persons without anything to eat at all. Even clean water has become a scare resource: "Some of the only water inmates were able to drink came from tiny sinks inside the pens and without cups, detainees used their unwashed hands to scoop up sips, or put their mouths under the faucets."[27]

120.    In some cases, persons on prescription diets have received meals completely contrary to that prescription, forcing them to choose between not eating or eating something that will likely make them sick, while those without prescription diets may still get sick due to rotting food. And when the DOC's food (or lack thereof) causes such sickness, emergency and preventative medical care is essentially nonexistent.[28]

121.    Because the City has not acted to remedy dysfunction in the DOC's food distribution system, and because the DOC's staffing crisis is far from resolved, essentially every person incarcerated on Rikers has experienced this denial of adequate nutrition and access to sanitary meals, in violation of their constitutional rights and against all basic human decency.

**C. Violence is rampant among both guards and detained persons, and the incarcerated population is constantly under threat of injury or death.**

122.    The City has been deliberately indifferent to the culture of violence prevalent on Rikers Island, and the resulting fear that people there experience on a daily basis.

123.    Southern District Court Judge Swain, who oversees the court-ordered monitorship at Rikers, has described Rikers as suffering from "extremely dangerous" conditions "in which

---

[27] *See* Fonrouge, *supra* n.7.
[28] *See* Correctional Health Services, CHS Access Report: November 2021 (February 7, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/Correctional-Health-Authority-Reports/CHS-Access-Report-CY21Q4.pdf.

every single day people are in danger."[29] A special report filed by the monitoring team in March 2022 described "unacceptable levels of fear of harm" resulting from dysfunctional staff management and deployment practices at the Department of Correction.[30]

124.    The pervasiveness of this violence—which is predicated on a long-standing culture of brutality by DOC staff—means that every person detained on Rikers, even those who have not yet experienced this violence themselves, nonetheless live in constant fear that they may be next.

125.    As early as 2014, the U.S. Attorney for the Southern District of New York reported on this "pervasive" and "deep-seated culture of violence" across Rikers Island, noting that "DOC staff routinely utilize[s] force not as a last resort, but instead as a means" of "control" and to "punish disorderly or disrespectful behavior."[31]

126.    In November 2017, the *Nunez* Monitor made similar observations concerning the entrenched culture of "staff actions and behaviors that too often engender, nurture, and encourage confrontation" rather than deescalate and end conflict between incarcerated individuals.[32] The Report attributed this "tendency to engage in [a] pattern of hyper-confrontation" to "unprofessional conduct" driven by the "inexperience of Staff."[33]

127.    A report published by the New York State Commission of Correction in February of 2018 ("COC Report") found that, in 2017, the rate of violence on Rikers was significantly higher

---

[29] *See* Transcript of Remote Conference at 6:17, *Nunez v. City of New York, et al.*, 11-cv- 5845 (LTS) (S.D.N.Y. Apr. 26, 2022), ECF No. 456.

[30] *See* Special Report of the *Nunez* Independent Monitor at 4, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.

[31] *Id.* at 3.

[32] *See* Fourth Report of the *Nunez* Independent Monitor at *10, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Oct. 10, 2017), ECF No. 305.

[33] *See Id.* at *11.

than county jails throughout New York State.[34] Despite having less than half the combined population of these county jails, the number of group or gang assaults and assaults among incarcerated individuals on Rikers was more than double than in the county jails, while the number of assaults involving staff was more than <u>ten</u> times higher than the rest of the state.[35]

128.   But despite being "plagued by managerial failures" and "significant structural problems," the COC Report said, the DOC "demonstrated both an unwillingness and inability to take necessary actions to remedy identified violations [] concerning facility safety and security."[36]

129.   The problem only worsened the following year. In 2018, the New York City Comptroller's Office found that, despite a declining detainee population, rates of violent incidents and uses of force continued to increase.[37] There were approximately 1,354 fights or assaults per 1,000 average daily population in 2018, compared with only 441 ten years earlier in 2008.[38]

130.   Then-Comptroller Stringer stated in a press release that "the DOC is spending more money with more staff to guard fewer people, yet rates of violence and assault continue to rise which is troubling both for our detained population and for correction officers."[39]

131.   By 2019, use of force by DOC officers had jumped nearly 30 percent from 2018,

---

[34] New York State Commission of Correction, *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* (Feb. 2018), https://scoc.ny.gov/pdfdocs/Problematic-Jails-Report-2-2018.pdf.
[35] *Id.* at 29-30.
[36] *Id.* at 3.
[37] *See* NYC Comptroller, Press Release, *Despite a Decline in Incarceration, Correction Spending, Violence, and Use of Force Continued to Rise in FY 2018* (Jan. 22, 2019), https://comptroller.nyc.gov/newsroom/comptroller-stringer-despite-a-decline-in-incarceration-correction-spending-violence-and-use-of-force-continued-to-rise-in-fy-2018/.
[38] *See Id.*
[39] *See Id.*

up to 6,670 from 5,175 in 2018.[40] Violence among incarcerated people also skyrocketed, from 55.8 incidents for every 1,000 people in 2018, to 69.5 in 2019, a 24.5 percent increase.[41] The rate of serious injury to individuals at Rikers as a result of violent incidents rose nearly 24 percent.[42]

132.    In 2020, uses of force by guards against detained persons rose 183 percent from 2016.[43] More than half of these incidents were found to be avoidable or problematic, and around 30 percent were determined to be excessive or violative of the DOC's use of force policies.[44]

133.    Requests for basic services by detained persons are often met with brutality, as staff increasingly over relies on specialized teams such as the ESU—an enforcement unit well-known to respond to the population indiscriminately with punitive and dangerous tactics.[45]

134.    For example, in the early months of a pandemic, a group of detained persons voiced frustration with new isolation and lockdown protocols related to social distancing. In response to these vocal complaints, an ESU team lined the men up, searched them, and told them to return to their cells. For no clear reason, ESU proceeded to violently attack one detainee, knocking his tooth out as they slammed him to the floor and sprayed him in the eyes with a chemical agent. They then placed a hood over his head and over-tightened restraints around his wrists before leaving him left bloodied in a cell, with the hood and restraints still on. The officers went on to fabricate a report claiming that the man instigated the assault.

---

[40] Erin Durkin, *New Stats Show Surge in Violence at Rikers Island*, Politico (Sept. 17, 2019), https://www.politico.com/states/new-york/albany/story/2019/09/17/new-stats-show-surge-in-violence-at-rikers-island-1193798.
[41] *See id*; *see also* Julia Marsh, *Violence Spikes at Rikers Island Despite Jail Population Decline*, N.Y. Post (Sept. 17, 2019), https://nypost.com/2019/09/17/violence-spikes-at-rikers-island-despite-jail-population-decline/.
[42] *See Id.*
[43] *See* Eleventh Report of the *Nunez* Independent Monitor at *26, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) at *26 (S.D.N.Y. May 11, 2021), ECF No. 368.
[44] *See Id.* at *27.
[45] *See Id.* at *50-51 (S.D.N.Y. May 11, 2021).

135.    In 2021, the rate at which guards used force against detained persons was 200 percent higher than the rate in 2016 that gave rise to the *Nunez* consent decree.[46] There were a total of 419 slashings and stabbings on the Island that year, up 1,097 percent from 2011, despite a steadily declining incarcerated population.[47]

136.    The year of 2021 also saw a 22.5 percent increase from the prior year in violent incidents among individuals in custody.[48] More than 1,900 detained persons suffered lacerations, concussions, or broken bones, and at least 450 of those were so severely injured that they were hospitalized.[49] Given the pervasive failures of DOC staff to take injured people for prompt (or any) medical treatment, the actual rate of hospitalizations is likely much higher, evidencing the City's *de facto* policy of underreporting serious injuries.[50]

137.    On September 28, 2021, Governor Hochul issued an Executive Order declaring that Rikers Island was in a state of emergency because "conditions in the facilities have led to an unsafe, life-threatening environment for both the inmates and the staff."[51] Nine subsequent Executive Orders extended the State of Emergency, which remains in place today.[52]

138.    By the end of April 2022, a shocking 191 stabbing incidents had already occurred

---

[46] *See* Special Report of the *Nunez* Independent Monitor at *17, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.
[47] https://nypost.com/2022/05/14/rikers-island-sees-surge-of-stabbings-and-slashings/ (citing figures shared during a public DOC meeting).
[48] https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2021/2021_mmr.pdf.
[49] Jan Ransom and William K. Rashbaum, *How Brutal Beatings on Rikers Island Were Hidden from Public View*, N.Y. Times (March 2, 2022),
https://www.nytimes.com/2022/03/02/nyregion/nyc-jail-beating-rikers.html.
[50] NYC Board of Correction, *Serious Injury Reports in NYC Jails January 2019*, (last visited June 24, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2019.01.07%20-%20BOC%20Serious%20Injury%20Report%20-%20Final.pdf.
[51] N.Y. Exec. Order No. 5, https://www.governor.ny.gov/executive-order/no-5-declaration-disaster-emergency-counties-bronx-kings-new-york-richmond-and.
[52] N.Y. Exec. Order No. 5.9, https://www.governor.ny.gov/sites/default/files/2022-06/EO_5.9.pdf.

on the Island, putting that number on track to reach 575 total stabbings over the course of the year, a 37 percent increase from 2021.[53]

139.    Comparatively, the rate of staff assaults and fights in DOC facilities is seven to eight times higher on the Island than in the rest of New York State or Los Angeles County,[54] and the *Nunez* monitoring team has taken pains to "emphasize that these high rates [of violence] are *not* typical, they are *not* expected, they are *not* normal" (emphases in original).[55] The Monitor has insisted that these numbers are "abnormal" and "in no way conform to generally accepted practices in the [corrections] field." [56]   The sheer number of these incidents, the Monitor opined, should "catalyze an urgency that befits the gravity of the situation."[57]

140.    Moreover, the severity of violent incidents on the Island are frequently downplayed and misrepresented in official DOC reports, creating an inaccurate record of the actual prevalence of injuries and staff assaults on Rikers, and preventing oversight agencies or the federal monitor from accurately assessing the pervasiveness of violence on the Island.

141.    For example, in August of 2021, a man in intake was beaten so badly by another detainee that he was paralyzed from the neck down, but no report of the incident was ever filed.[58]

142.    In December 2021, a 25-year-old man was slammed to the floor and kicked in the head by another incarcerated person, causing him to spend six weeks in a coma and relearn how

---

[53] Griffin Kelly, *Stabbings and slashings surge on Rikers Island*, N.Y. Post (last updated on May 14, 2022), https://nypost.com/2022/05/14/rikers-island-sees-surge-of-stabbings-and-slashings/ (referencing statement from Board of Correction member).
[54] *See* Special Report of the *Nunez* Independent Monitor, *Nunez*, 11-cv-5845, ECF No. 438 at *4 (S.D.N.Y. Mar. 16, 2022).
[55] *See Id.* at *17 (S.D.N.Y. Mar. 16, 2022).
[56] *See Id.* at 18.
[57] *See Id.*
[58] *See* Jan Ransom and William K. Rashbaum, *How Brutal Beatings on Rikers Island Were Hidden from Public View*, N.Y. Times (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/nyregion/nyc-jail-beating-rikers.html.

to walk and talk. The report of his injury stated that he had suffered from a fractured eye socket and swelling of the head and had not required hospitalization.[59]

143.    In April 2022, a 47-year-old man got into a fight with a detainee and suffered a head injury so severe that he had to undergo emergency surgery and is now partially paralyzed, while DOC records say he suffered only a laceration on the left side of his head.[60]

144.    Common security breaches include failing to secure doors, failing to supervise detained persons, allowing detained persons to congregate, going off-post, using restraints improperly, or failing to intervene in escalating tensions.[61]

145.    In one case, a detainee passed through an unsecured door and threw scalding water on another individual, causing second-degree burns. The *Nunez* Monitor, in a report from August 24, 2021, found that this incident was "predicated on multiple security breaches."[62]

146.    In January 2022, the DOC reported at least forty incidents where detained persons left their cells or housing units without authorization, and approximately sixty cases of security breaches resulted in incidents of force and violence among detained persons.[63]

147.    Moreover, when the disciplinary records of correction officers were finally made public with the repeal of Section 50-a of New York's civil rights statute in 2021, the data supported what detained persons on the Island have been reporting for years—that they are brutalized and then punished to cover up the officers' misconduct.

---

[59] *See Id.*
[60] *See* Jan Ransom, *As Pressure Builds Over Rikers Crisis, a Drumbeat of Death and Disorder*, N.Y. Times (May 23, 2022), https://www.nytimes.com/2022/05/23/nyregion/rikers-island-death-crisis.html.
[61] Letter to Court Regarding Present Conditions, *Nunez*, No. 11 cv 5845 at ECF No. 378 at 2 (S.D.N.Y. Aug. 24, 2021).
[62] *See Id.*
[63] *See* Special Report of the *Nunez* Independent Monitor, *Nunez*, No. 11-cv-5845 at ECF No. 438 at *18-19 (S.D.N.Y. Mar. 16, 2022).

148.    Over a twenty-month period, more than half of the uses of force reported by DOC staff included false and misleading statements, omissions, and outright lies about the circumstances surrounding the incident. When confronted with these facts, the DOC did not discipline or otherwise punish the officers for these lies; instead, they implemented a course to "improve their writing skills and to teach them how to complete official incident reports."[64]

149.    While detained persons are often punished after they are victimized by guards, correction officers are rarely held accountable for excessive uses of force or other misconduct. And the City has a substantial backlog of disciplinary actions pending against its officers, which can take over a year from the time of the incident to resolve.[65]

150.    In fact, at a public hearing on April 26 of this year, Commissioner Molina conceded that a "timely and meaningful discipline process . . . quite frankly has never existed in this department," demonstrating how mismanagement and poor oversight, including a lack of discipline, contributes to rampant and increasingly dangerous violence on the Island. [66]

151.    One report found that the City's inability to manage large numbers of staff productively has a direct impact on the ability to effectively reduce levels of violence and ensure safety. *Nunez* Monitor Steve J. Martin stated that the "state of seriously compromised safety has spiraled to a point at which, on a daily basis, there is a manifest risk of serious harm to both

---

[64] *See* Jan Ransom, *In N.Y.C. Jail System, Guards Often Lie About Excessive Force*, N.Y. Times (published Apr. 24, 2021, updated Sept. 22, 2021),
https://www.nytimes.com/2021/04/24/nyregion/rikers-guards-lie-nyc-jails.html#:~:text=In%20N.Y.C.-Jail%20System%2C%20Guards%20Oftens%20Lie%20About%20Excessive%20Force,filed%20incomplete%20or%20inaccurate%20reports..
[65] *See* Eleventh Report of the *Nunez* Independent Monitor, *Nunez*, No. 11-cv-5845 at ECF No. 368 at *14 (S.D.N.Y. May 11, 2021).
[66] *See* Transcript of Remote Conference, *Nunez*, No. 11-cv- 5845 at 27:16 (Apr. 26, 2022).

detainees and staff, which in turn generates high levels of fear among both groups."[67]

152.    This universal and reasonable fear is fueled by this pervasive violence as well as every other issue identified in this complaint—from the deteriorating physical conditions of the facilities to the lack of emergency and medical care. Under the law, the City must provide essential services and protect those within their custody. But in reality, those detained are Rikers are forced to fend for themselves.

**D.  Gang control within Rikers has been allowed to pervade all aspects of the lives of detainees.**

153.    In some intake and housing areas, where no guards are to be found, gang rule has slowly taken over, leaving detained persons vulnerable to yet another means of violence.

154.    In 2014, the DeBlasio administration, under mounting pressure to decrease the violence by guards and inmates within Rikers, discontinued DOC's rotation policy, whereby incarcerated individuals were re-housed regularly in an effort to prevent detainees from banding together.[68] Where the rotation policy meant rival gang members would be housed together, the new policy has wardens placing members of the same gang within the same housing unit, under the mistaken rationale that violence would decrease.[69]

155.    The reality is that these housing units are now "owned" by certain gangs, allowing gang members to take advantage of guard shortages to control every aspect of life within the unit: Incarcerated persons are manning the guards' stations, answering phones, and determining who can enter and exit certain areas, while guards are utilizing mace indiscriminately and giving

---

[67] *See* Letter on Present Conditions, *Nunez*, No. 11 cv 5845 at ECF 378 at *4 (S.D.N.Y. Aug. 24, 2021).
[68] Jan Ransom & Bianca Pallaro, "Behind the Violence at Rikers, Decades of Mismanagement and Dysfunction," The New York Times (Dec. 31, 2021), https://www.nytimes.com/2021/12/31/nyregion/rikers-island-correction-officers.html
[69] *Id.*

detained persons make-shift weapons, instigating violence and further contributing to disorder. With no guards to be found, detained persons are left vulnerable to gang violence.

156.     In some of these units, guards have turned a blind eye to "fight nights" where detained persons are pitted against each other by gang members, and guards watch them fight. Civilian employees report watching as uniformed staff stand by and merely observe the chaos, either out of sheer fear of intervening or callousness toward the state of affairs. Other times, staff gratuitously and indiscriminately uses pepper spray as a shortcut for breaking up disputes.[70]

157.     Non-affiliated detainees who are targeted by a gang and assaulted are often placed by DOC back into the very housing unit where they were beaten, allowing for the abuse to continue. In other cases, where a former gang member is being placed at Rikers, guards will knowingly place the individual in a housing unit run by their former gang, regardless of the obvious risk for retaliation and/or violence.[71]

158.     These conditions have led to a reasonable, universal fear amongst the incarcerated population that they are under a real and constant threat of violence, whether it be excessive force by guards or violence at the hands of their fellow detained persons. This fear is exacerbated by the fact that DOC staff is unlikely to intervene in violent encounters, and that injured persons will not be afforded a timely, adequate medical response if they become the victim of such violence.

**E.  Emergency and preventative medical and mental health care is unavailable.**

159.     A pervasive fear of violence among detained persons is exacerbated by the DOC's proven failure to adequately respond to injuries that result from violent encounters. In a letter dated

---

[70] Jan Ransom, "A Look Inside Rikers: 'Fight Night' and Gang Rule, Captured on Video," The New York Times (Jan. 12, 2022), https://www.nytimes.com/2022/01/12/nyregion/rikers-jail-videos.html.
[71] *Id.*

September 10, 2021, Dr. Ross MacDonald, the Chief Medical Officer of Correctional Health Services ("CHS"), stated that the "[u]navailability of staff has resulted in delays in transferring patients to clinics for care, to mental health units, or to the hospital, even when 911 has been activated and EMS has arrived to transport them."[72] As a result, tasks like distributing medication and transferring patients to clinics for care have fallen to the wayside.[73]

160.    Limitations on accessing mental and medical healthcare begin at intake: when a detained person is brought to Rikers Island, days may pass until they are given a preliminary medical screening, which should occur promptly upon their arrival. During that time, individuals are frequently deprived of medications that they require for the treatment of ongoing conditions.

161.    In 2022 alone, nine people have died in custody on Rikers Island.[74] In 2021, that number was sixteen.[75] Dr. MacDonald attributed the deaths to a collapse in basic jail operations, including the delays in medical care, which he said were caused by the unavailability of correction officers.[76]

162.    Jeanette Merrill, a spokesperson for CHS, has also expressed that "[t]he department's staffing shortages are affecting health operations, including the availability of escorts

---

[72] Ross MacDonald, M.D. Letter to Keith Powers (Sept. 10, 2021), https://www.ny1.com/content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf.
[73] *Id.*
[74] *See* Jonah E. Bromwich and Jan Ransom, *3 N.Y.C. Detainees Die in Less Than a Week, Bringing Year's Total to 9*, N.Y. Times (June 22, 2022), https://www.nytimes.com/2022/06/22/nyregion/rikers-inmate-deaths.html.
[75] *See* Michael Wilson and Chelsea Marcius, *16 Men Died in New York City Jails Last Year. Who Were They?*, N.Y. Times (published Jan. 28, 2022, updated Jan. 31, 2022), https://www.nytimes.com/2022/01/28/nyregion/rikers-island-prisoner-deaths.html#:~:text=At%20least%2016%20people%20died,mainland%20by%20the%20East%20River.
[76] *See* Gloria Pazmino, *Rikers Island Detainees Expose Lack of Medical Care While in Custody*, NY1 (Sep. 21, 2021), https://www.ny1.com/nyc/all-boroughs/public-safety/2021/09/22/rikers-island-detainees-expose-lack-of-medical-care-while-in-custody.

to bring patients to the clinic and of DOC personnel to staff the clinics."[77]

163.    A Board of Corrections report into the DOC's responsibility for the death of persons in their custody found similar deficiencies in access to emergency medical care: "DOC and CHS do not seem to have an acceptably functioning system for providing emergency care to persons in life-threatening situations."[78] (emphasis added).

164.    The report identified significant delays in responsive emergency care for persons experiencing fatal medical emergencies.[79] In two cases, only one officer was stationed in the control unit bubble, despite DOC policy requiring two officers.[80] And in at least three cases resulting in death, detained persons were the first to provide aid and notify DOC staff of the medical emergencies.[81]

165.    According to former Commissioner Schiraldi, inadequate staff is the sole reason for missed medical appointments.[82] New York City Comptroller Brad Lander also told the City Council that when he toured DOC facilities in September 2021, medical providers told him they were not seeing 90 percent of the people on their call list each day.[83]

166.    The DOC does not even deny they lack the manpower necessary to provide constitutionally adequate medical care. In a filing in *Agnew, et al. v. New York City Department*

---

[77] *Supra* n.34.

[78] City of New York Board of Corrections, *February & March 2022 Deaths in DOC Custody Report and Recommendations* 7 (May 9, 2022), available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports /BOC-Reports/deaths-report-and-chs-response-202202-202203.pdf (emphasis added).

[79] See *Id.*

[80] *See Id.* at 6.

[81] See *Id.*

[82] *Id.* at 98:10–12.

[83] *See* Transcript of New York City Council Hearing of September 15 at 86:20–21, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5117031&GUID=C0114C55-A2DB-430F-84B3-3A451359F9AF&Options=&Search=.

*of Correction*, Index No. 813431/2021E, the DOC admitted that:

167.    Respondent [the DOC] does not dispute the applicability of the mandates and has freely acknowledged deficiencies in its ability to escort individuals in custody to clinic appointments, primarily due to lack of staff in the jails. … There is no real dispute between the parties as to the following facts: DOC is required to provide access to medical care for individuals in its custody, and the inability to consistently do so is due to serious staff shortages related to the pandemic.

168.    The City's deliberate indifference to these issues has interfered with timely and adequate medical care for years. In November 2018, 21 percent of incarcerated people who needed specialty medical services were not produced to on-Island specialty clinics.[84] That number increased to 30–33 percent in November 2019 and 2020[85][86], and leapt to a shocking 53 percent in November 2021.[87] Medical care is even denied by staff as a form of punishment, or because gang members, who have taken control in the jails,[88] obstruct access for persons seeking care.[89]

169.    On May 13, 2022, Bronx Supreme Court Judge Taylor found the DOC in contempt

---

[84] *See* Correctional Health Services, CHS Access Report: November 2018 (January 29, 2019), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/CHS_Access_Report_Nov_2018_v2.pdf.

[85] *See* Correctional Health Services, CHS Access Report: November 2019 (February 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/chs-access-report-q4cy19.pdf.

[86] *See* Correctional Health Services, CHS Access Report: November 2020 (August 31, 2021), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/chs-access-report-cy20q4.pdf.

[87] *See* Correctional Health Services, CHS Access Report: November 2021 (February 7, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/Correctional-Health-Authority-Reports/CHS-Access-Report-CY21Q4.pdf.

[88] Ransom, Jan, "A Look Inside Rikers: 'Fight Night' and Gang Rule, Captured on Video," The New York Times (January 12, 2022), https://www.nytimes.com/2022/01/12/nyregion/rikers-jail-videos.html

[89] Ransom, Jan, "Judge Faults Medical Care for Detainees in Latest Sign of Rikers Crisis," The New York Times (May 17, 2022), https://www.nytimes.com/2022/05/17/nyregion/nyc-correction-department-rikers.html.

of a December 2021 court order directing the DOC to provide access to sick call and not prohibit or delay access to health services.[90] But that December, 1,061 medical appointments were missed because of a lack of officer escorts.

170.    One detainee was forced to wait over two months before receiving medical attention for scabies—an itchy condition caused by mites that is very easy to transfer to other people—despite repeated requests to see a doctor for weeks. Another man was made to wait for six weeks for treatment after his fingers were badly jammed; by the time he was seen by the medical staff, his fingers were permanently twisted.[91] These significant delays functionally amount to a complete denial of emergency medical care.

171.    These problems are exacerbated by the virulent Delta variant of COVID-19, whose spread throughout the jail has been enabled by overcrowding in holding cells. As of September 2021, Covid-19 rates outpaced the spread of the disease in the rest of the city. People experiencing flu-like symptoms typically must wait up to a week to be seen by a doctor—too long to isolate cases and staunch the spread of the virus. One person who died in custody contracted Covid-19 in a crowded intake cell where he was held for ten days after his arrest.[92]

172.    Productions to mental health appointments are similarly dismal. Between November 2018 and November 2021, 19 to 35 percent of mental health appointments were missed because staff failed to produce detained persons to their mental health services.[93] George

---

[90] *See Agnew et al v. New York City Dep't of Corr.*, Index No. 813431/2021E (Sup. Ct. Bronx Co. 2021), NYSCEF Dkt. No. 126.

[91] *See* Sherman, Rachel, "Rikers Staffing Crisis Limits Access to Medical Care," The City (Aug. 26, 2021), available at https://www.thecity.nyc/health/2021/8/26/22643199/rikers-staffing-crisis-medical-care.

[92] *See* Gloria Pazmino, "Rikers Island Detainees Expose Lack of Medical Care While in Custody," NY1 (Sep. 21, 2021), https://www.ny1.com/nyc/all-boroughs/public-safety/2021/09/22/rikers-island-detainees-expose-lack-of-medical-care-while-in-custody.

[93] *See* nn. 46-49, *supra*.

Anderson, a mental health administrator for CHS, said that "with such long wait times for medical care—sometimes weeks, where it was once days—there is now greater incentive for detained persons to self-harm in order to be seen."[94]

173.    Self-harm in the city's jails is, in fact, on the rise. In March of 2021, "148 people harmed themselves, including 12 seriously."[95] Despite this, the small group of staffers available is not properly trained in suicide prevention.[96]

174.    Because of the severe absenteeism, officers are not around to prevent incarcerated individuals from self-harming, oftentimes finding someone well after they are severely injured or have died.[97] Other times, the few officers who are available are in the midst of triple shifts, raising questions about their ability and capacity to properly surveil at-risk populations or intervene in mental health crises.[98]

175.    Since December 2020, at least seven people detained in the DOC's custody have committed suicide, including Brandon Rodriguez; Segundo Guallpa; Wilson Diaz Guzman; Tomas Carlo-Camacho; Javier Velasco; Anthony Scott, and Dashawn Carter.

176.    The unavailability of emergency and preventative care, as well as these increased incidents of self-harm and suicide are emblematic of the larger problem all detained persons on Rikers Island experience: Constant stress and fear that takes a significant toll on incarcerated

---

[94] *Id.*

[95] *See* Jan Ransom, "Disorder and Chaos in N.Y.C. Jails as Pandemic Recedes," The New York Times (Pub. June 19, 2021, Updated Oct. 18, 2021), https://www.nytimes.com/2021/06/19/nyregion/rikers-island-chaos-suicides.html.

[96] *Id.*

[97] *Id.* (providing various instances in which inmates were found hanging in their cells, including one inmate who had been left hanging for 15 minutes).

[98] *See* Jonah E. Bromwich and Jan Ransom, *An 'Absolute Emergency' at Rikers Island as Violence Increases*, The New York Times (Oct. 11, 2021), https://www.nytimes.com/2021/08/24/nyregion/rikers-island-emergency-chaos.html.

peoples' mental and physical health, grinding away their will to live. Those detained know that, if they are attacked or become ill, or need assistance with an ongoing condition or acute crisis, they are unlikely to receive the help that they need.

177.    At the same time, the City's unmanageable staffing practices and continued indifference have severely limited access to necessary services known to improve overall wellbeing, including counseling, education, recreation, programming, and religious services. In sum, "[e]very person they send to jail is at great risk of harm or death."[99]

### F. The Department of Correction is experiencing a staffing crisis caused by years of mismanagement and poor policymaking by the City.

178.    Current DOC Commissioner Louis Molina recently admitted that his agency's security practices "are deeply flawed . . . and illogical even to those with no law enforcement experience," and that "inadequate supervision at the facility level" has created dysfunction throughout the system.[100]

179.    The current staffing practices—the result of years of mismanagement, antiquated tracking systems, increasing absenteeism, and an overreliance on uniformed officers who lack effective leadership—serve as a stark example of the City's indifference and resistance to reform.

180.    In reality, DOC employs more than sufficient staff,[101] but cannot effectively manage or control them.[102]

---

[99] *Id.*
[100] Conference Transcript at 25, *Nunez*, 11 Cv. 5845 (S.D.N.Y. April 26, 2022).
[101] *See* Lauren Gill et al., "Hundreds of New City Jail Officers for Rikers Put Detainee Advocates on Guard," The City (Jul. 11, 2021), https://www.thecity.nyc/2021/7/11/22572991/rikers-island-getting-more-jail-guards-correction-officers (reporting that the DOC employs a number of guards per detainee at a rate seven times higher than the national average).
[102] Jan Ransom and Pallaro, Bianca, "Behind the Violence at Rikers, Decades of Mismanagement and Dysfunction," The New York Times (Dec. 31, 2021), available at https://www.nytimes.com/ 2021/12/31/nyregion/rikers-island-correction-officers.html.

181.     The antiquated ways in which the City manages its correctional staff are well documented by the court-appointed federal monitor assigned to Rikers Island.[103] The Board of Correction and the *Nunez* monitor have urged DOC to create a modern system to deploy staff, as DOC "does not utilize roster management software to manage daily staff assignments, which is particularly concerning given the size of the agency and the individual facilities and the number of modifications required." [104]

182.     As a result, "[d]aily shift schedules are modified by hand-written notes and [are] manually manipulated. Facility rosters are disorganized, are constantly adjusted and are difficult to decipher."[105] This outdated and inefficient system makes it "extremely difficult, if not impossible, to clearly track where all scheduled staff [are] assigned."[106]

183.     Commissioner Molina has criticized his agencies policies directly, stating that "[s]taffing practices and procedures do not allow [the DOC] to be effective operationally." Molina observed that there is "no accountability in a number of areas" pertaining to staff misconduct, and that the City and its DOC leadership have "created an environment where the discipline needed to operate a law enforcement agency [i]s absent."[107] The City has known about these issues for years, but has not reworked its policies to encourage existing staff to attend work regularly or perform their roles effectively, or hold accountable those who do not.

184.     Notwithstanding the 2015 consent decree in *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF), or its group of court-appointed monitors who have made

---

[103] Consent Judgment, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Oct. 21, 2015), ECF No. 249.
[104] Special Report of the *Nunez* Independent Monitor at ¶12, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Mar. 16, 2022), ECF No. 438.
[105] *Id.*
[106] *Id.*
[107] Conference Transcript at 26, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Apr. 26, 2022), ECF No. 456.

dozens of solution-oriented recommendations concerning these issues (particularly concerning the deeply ingrained culture of violence promulgated by DOC officers), the City, DOC, and most recently Commissioner Molina, have failed to adequately screen, train, supervise, or discipline their officers for misconduct; have failed to ensure that their employees show up to work (or are at least disciplined for excessive absences); and have failed to repair the broken staffing system to ensure that those who attend their shifts end up assigned to posts where they are most needed.

185.   The City has known about these issues for years but has not reworked its policies to encourage existing staff to attend work regularly or perform their roles effectively or hold accountable those who do not.

186.   Put simply, if the City of New York, its politicians, police, and the City's district attorneys insist on detaining thousands of people pretrial or on parole holds (some for extraordinary amounts of time), then the City must also ensure that there are enough well-trained correction officers in the posts where they are needed, ready and capable of doing their job.

187.   Part of the cause of the abhorrent conditions on Rikers Island is the City's poor leadership and persistent failures to adequately screen correction officers before they are hired; to properly train employed officers on how to keep incarcerated individuals safe and ensure that they receive the care and services to which they are constitutionally entitled; and to effectively manage, supervise, and discipline officers after their initial employment with the agency.

188.   With staff absenteeism on the rise since at least 2018, the City's pervasive failures to train and supervise staff are laid bare. DOC employees on the Island are ill equipped to handle the sheer numbers of detained persons or the deteriorating physical conditions.

189.   In May 2021, the federal monitor appointed in *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF), published his eleventh report, which found three

overarching issues hindering much-needed progress on Rikers Island—all of which related to poor leadership and improper staffing:

> First, the poor quality of Facility leadership hinders progress and must be addressed for the Agency to ever become successful. Second, the dysfunctional deployment and overstaffing of certain posts in the Facilities must be reevaluated to ascertain whether resources are properly assigned and whether the Staff assigned to each post actually meet their responsibilities consistently, without simply outsourcing the issue to a different group of Staff. Finally, the Department must have the ability to hold Staff accountable closer in time to the incident when they are not meeting their responsibilities and when misconduct occurs.[17]

190.    A Department of Investigation ("DOI") inquiry in 2015 also found that the process for hiring DOC staff was inconsistent and dangerous; historically, potential hires were not screened for gang affiliations, and at least one-third of applicants who were hired during the investigatory period should have been disqualified or subjected to further screening, either because they had criminal records, were previously rejected from employment by other law enforcement agencies, had serious psychological diagnoses that could affect their job performance, or had relatives detained on the Island, creating potential security risks.[108]

191.    These practices quickly led to the employment of persons closely associated with gangs,[109] persons with violent criminal records, and at least one person who was found to be psychologically unfit for duty but was nonetheless hired because of her friendship with union leadership.[110]

---

[108] *See* Mark G. Peters, Commissioner, *New York City Department of Investigation Report on the Recruiting and Hiring Process for New York City Correction Officers*, (Jan. 2015), https://www1.nyc.gov/assets/doi/press-releases/2015/jan/pr01rikers_aiu_011515.pdf.
[109] *See* Liam Stack, *2 Rikers Guards Set Up Attack on Inmate, Officials Say*, N.Y. Times (Sept. 17, 2015), https://www.nytimes.com/2015/09/18/nyregion/2-rikers-guards-set-up-attack-on-inmate-officials-say.html.
[110] *See* Michael Schwirtz and Michael Winerip, *Warning Signs Overlooked in Hiring for New York City Jails*, N.Y. Times (Jan. 15, 2015),

192.    More recently, DOC officers were caught coordinating with gangs to bring drugs and other contraband into the City's jails in exchange for cash payments, fueling violence and substance abuse on the Island,[111] and at least six correction officers were charged with federal crimes in January 2022 for their alleged connections to the criminal enterprise, which DOI Commissioner Margaret M. Garett identified as part of a pattern of "contraband-smuggling conspiracies [that] have long plagued City jail facilities."[112]

193.    Exacerbating these hiring and oversight deficiencies is an overall lack of effective training. In 2016, former Mayor Bill de Blasio and corrections union leaders agreed that the small storefront in Queens used by the DOC to train its officers was insufficient to accomplish the agency's training goals, adding that a new facility should have been built 5 or 10 years earlier.[113]

194.    On August 6, 2021, the DOC—who had not addressed the issue of a new training facility in the five years following de Blasio's statement that the project was *already* 5 to 10 years behind—issued a press release wherein it admitted that "New York City has long needed a modern academy designed around best correctional training practices."[114]

---

https://www.nytimes.com/2015/01/15/nyregion/hired-for-new-york-jails-despite-warning-signs.html.

[111] *See* Associated Press, *Rikers guards accused of smuggling contraband to gang members*, ABC News 10 (Apr. 6, 2022), https://www.news10.com/news/ny-news/rikers-guards-accused-of-smuggling-contraband-to-gang-members/.

[112] Press Release, "Six New York City Correction Officers and 15 Others Charged with Conspiring to Accept Bribes and Smuggle Contraband into Rikers Island Facilities" U.S. Attorney's Office for the Eastern District of New York (Jan. 14 2020), https://www.justice.gov/usao-edny/pr/six-new-york-city-correction-officers-and-15-others-charged-conspiring-accept-bribes.

[113] *See* Jillian Jorgensen, "Rikers Island Will Have More Officers Than Inmates Under Proposed Budget," Observer (January 21, 2016), https://observer.com/2016/01/rikers-island-will-have-more-officers-than-inmates-under-proposed-budget/.

[114] *See* Press Release, "City Identifies Site for New Correction Academy," New York City Department of Correction (Aug. 6, 2021), https://www1.nyc.gov/site/doc/media/new_correction_academy.page.

195.     Almost a year later, the City has not even started construction on a new academy, and the expected completion of the academy is not until 2027— the same year the City expects to close Rikers. In the meantime, Rikers remains open, staff remain inadequately trained, and avoidable incidents occur every day on the Island as a result.

196.     The DOC itself can identify enormous gaps in its training: Only about 6 percent of correction officers have taken a yearly refresher course in suicide prevention (which is required of all 8,200 officers), and only 17 percent of uniformed staff which is required to take a mandatory fire safety course have completed the training, according to a spokesman for the agency.[115] This lack of training is shocking given that, as early as 2014, the former mayor acknowledged that the City has serious problems with training related to the mental health of detained persons within its care.[116]

197.     These improperly and inadequately trained officers are also severely mismanaged. The DOC allocates approximately 86 percent of its $2.6 billion budget to staffing[117]—more than its budget for programming and all other services for incarcerated individuals—despite the fact that the ratio of correction officers to incarcerated people in New York City is significantly higher than jails in the rest of the country:[118]

---

[115] *See* Chelsia Rose Marcius, "NYC Correction Dept. failing to give staffers up-to-date training in suicide prevention, fire safety as required," New York Daily News (Apr. 18, 2021), https://www.nydailynews.com/new-york/ny-correction-department-training-suicide-prevention-fire-safety-rikers-island-20210418-mqzfxnwowfhz7a6odazue2smla-story.html.

[116] *See* n.2, *supra*.

[117] *See* VERA Institute, "A Look Inside the New York City Correction Budget" (May 2021) at 4, https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

[118] *Id.* at 5.



**Figure 4: Ratio of incarcerated people to corrections staff, NYC vs. United States**



1. In 2020, the incarcerated person-to-corrections officer ratio was 3:5 in New York City.[17]
2. In 2012, the incarcerated person-to-corrections officer ratio was 7:5 in New York City.
3. By comparison, in 2018, the national average for the incarcerated person-to-corrections officer ratio was 21:5.[18]
4. In 2020, the DOC's uniformed staff headcount was 9,237.[19]

198.    Notwithstanding these massive resources, DOC staff are not effectively managed and those in charge do not properly allocate the funds that are available in the DOC's budget. In fact, the DOC's staff management system is so outdated that staffing assignments are tracked by hand, on index cards.[119] Inevitably, this antiquated system leads to staffing problems, such as assigning someone to a post where a uniformed officer is not needed, or understaffing other posts where officers are needed, forcing some to work multiple back-to-back shifts.

199.    Overall, "[t]he Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff."[120]

200.    This poor leadership and mismanagement, coupled with the deplorable conditions on Rikers Island, have made it difficult for the DOC to attract and ultimately keep well-qualified correction officers on the Island.

201.    For example, over the last several years, the DOC employed approximately 7,500 correction officers on Rikers Island (and hundreds more at other facilities). According to COBA

---

[119] *See* Katrina Vanden Heuvel, "Opinion: Closing Rikers Island is a matter of life and death," Washington Post (Oct. 5, 2021), https:// death-crisis/.www.washingtonpost.com/opinions/2021/10/05/rikers-island- death-crisis/.
[120] *See* n. 115, *supra*.

President Benny Boscio Jr., the DOC lost 1,400 officers between 2019 and 2021,[121] in part due to the miserable workplace conditions.

202.     But hiring more uniformed officers is frequently associated with higher rates of violent and excessive uses of force against detained persons, and is often not a solution to disorder, especially in an era where the jail population is decreasing significantly.[122]

203.     Put simply, there are more than enough DOC staff on the City's payroll, but there is no way to make sure that they are placed where they are needed within each facility—a problem further complicated by rising absenteeism, which highlights these deep deficiencies in the DOC's staffing policies and practices.

204.     The overarching issue is one of corruption, poor leadership, and bad management. As Sarah Townsend, investigator for staff misconduct in the City's jails, recently stated:

> You see corruption in a lot of different places on Rikers Island. When I say corruption, I mean from both the union, which basically runs the place if you have a willing partner in the commissioner and mayor which you do now. But I also saw corruption with a lot of the officers and captains.[123]

205.     Ms. Townsend also stated that two of the biggest difficulties she faced in her role as an investigator were "the union and the structure of discipline in general."[124]

206.     The union's heavy influence on the City's operations is well known. In April 2020,

---

[121] *See* VERA Institute, "A Look Inside the New York City Correction Budget" (May 2021) at 6, available at https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

[122] *See* Steve J. Martin, "Eleventh Monitor's Report: July 1, 2020–December 31, 2020," at 11–14 (May 5, 2021) (finding that the "staffing issue seems to be one of roster management and deployment versus insufficient numbers of Staff"), https://www1.nyc.gov/assets/doc/downloads/pdf/11th_Monitor Report.pdf.

[123] *See* JB Nicholas, "Former Rikers Watchdog: "This Whole Fucking Thing Is A Racket," Hellgate NYC (May 3, 2022), https://www.hellgatenyc.com/nycs-former-jails-investigator-identifies-top-problem-on-rikers-corruption/.

[124] *Id.*

COBA, filed a lawsuit against the City alleging that its member officers were working triple shifts—where officers must work for 24 hours straight. But the City did nothing to resolve the situation, even though it was obvious that officers who work for 24 hours in a row are working in a severely diminished capacity, are more likely to inflict violence, and less likely to perform necessary aspects of their jobs.

207.   The former mayor responded to these reports by admitting that "[t]here should never have been 24-hour shifts. This was a dumb managerial mistake. It's not going to be allowed going from this point on, ever." But instead, it got worse.

208.   By February of 2021, correction officers were at a breaking point. The officers were still regularly working 24 hours shifts and were even sleeping in the parking lot because they were too tired to drive home. The DOC used a legal maneuver to delay the lawsuit challenging these working conditions, allowing the agency to keep the extended shifts.[125]

209.   In March of 2021, the news reports were even more dire, as officers were working double and triple shifts, without breaks for food or water. At that point, there had not been a new class of recruits for approximately two years.[126]

210.   In May of 2021, the lack of available, qualified officers led staff to put an entire facility of detained persons with severe mental illness on lockdown. At least 1,200 officers called out sick that day, and another 700 were considered "medically restricted."  Approximately 1,901 detained persons were forced to stay in their cells, without recreation or services, for at least 13

---

[125] *See* Video: "I-Team: Correction Officers' Claims of Grueling 24-Hour Shifts," NBC New York (Feb. 15, 2021), https://www.nbcnewyork.com/news/local/i-team-correction-officers-claims-of-grueling-24-hour-shifts/2889988/

[126] *See* Video: "Rikers Officers Claim They're Told to Work 24-Hour Shifts Without Breaks, Food Or Water," NBC New York (Mar. 24, 2021), https://www.nbcnewyork.com/news/rikers-officers-claim-theyre-told-to-work-24-hour-shifts-without-breaks-food-or-water/2962998/.

hours. There were at least 11 similar lockdowns on the Island over the past year.

211.    In June 2021, one officer reported that she "had not eaten or had a break from her post at a facility on Rikers Island in more than 16 hours. When a fight erupted . . . she was too tired to stop it . . . she had worked 15 24-hour shifts since the fall [and] started sleeping in her car . . . because she was too tired to drive home and often had to return in a matter of hours."[127]

212.    Currently, nearly one-third of COs are either not showing up to work or not available to work with incarcerated people. And on some days, almost half of the staff is missing. In May 2022, an incarcerated individual even stole a logbook to help document the utter lack of guards on the Island.[128] The same month, DOC correction officer committed suicide, which the union's president attributed to the officer's job at the DOC.[129]

213.    Correction officers have become so angry with their situation on the Island that they have also started organizing "sick outs," where as many as 1 in 5 officers at a time were calling in sick, allegedly as a form of illegal strike, or possibly because the working conditions had actually made them sick. Either way, staffing problems have worsened. In July 2021, the DOC had a total of 8,800 uniformed staff members, but 1,600 were on sick leave, 1,400 were medically monitored and unable to work, and 2,200 simply did not come to work that month.[130]

---

[127] *See* Jan Ransom, "Disorder and Chaos in N.Y.C. Jails as Pandemic Recedes," The New York Times (Pub. June 19, 2021, Updated Oct. 18, 2021), https://www.nytimes.com/2021/06/19/nyregion/rikers-island-chaos-suicides.html.

[128] *See* Gabrielle Fonrouge, "Rikers inmate steals official log book—to complain about 'outrageous' lack of guards," New York Post (Jul. 26, 2021), https://nypost.com/2021/07/26/rikers-inmate-steals-log-book-to-complain-about-lack-of-guards/.

[129] Thomas Tracy, "NYC Correction Officer Jumps From Verrazzano Bridge, Dies By Suicide," New York Daily News (May 13, 2022), https://www.yahoo.com/news/amphtml/nyc-correction-officer-jumps-verrazano-181800489.html.

[130] *See* Jacob Kay, "Correction officers call for better conditions at Rikers," Queens Daily Eagle (Aug. 16, 2021), https://queenseagle.com/all/corrections-officers-call-for-better-conditions-on-rikers.

214.    In July of 2021, there were reports that hundreds of correction officers were quitting the DOC altogether, calling it "the worst job in the world."[131] Many more officers were incapacitated by COVID-19, which has spread rampantly in the crowded jails.

215.    As abhorrent as these working conditions have become, it is the detained persons who suffer the most from the City's systemic failures. The obvious and only just solution is to stop sending people to Rikers Island and release or relocate those who are housed there. But the City and its law enforcement apparatus refuse to decarcerate the Island, so they must bear the cost of having properly trained staff, as well as the cost of adequately managing that staff and the facilities themselves and compensate the thousands of detained persons who have suffered as a result of these managerial failings.

216.    The staffing crisis at Rikers and the mismanagement of available employees leaves on-duty guards too exhausted to engage in their most basic duties. Tasks like distributing medication, separating detained persons by classification (an important security protocol), intervening in violent interactions, deescalating tensions between guards and detained persons, escorting incarcerated persons to programming, court appearances, legal visits, or the medical unit, or maintaining basic hygienic and habitable conditions for those housed on the Island, have all fallen by the wayside.

**G.  Rikers has a pervasive culture of violence among its staff.**

217.    In 2013, a class action was brought in the Southern District of New York on behalf of all present and future persons incarcerated on Rikers Island. *See, generally*, *Nunez et al. v. City*

---

[131] *See* Jack Newman, "'This is the worst job in the world': How hundreds of NYC correction officers have quit to join the NYPD after being forced to work back-to-back prison shifts," Daily Mail Online (Jul. 12, 2021), https://www.dailymail.co.uk/news/article-9780533/Hundreds-NYC-corrections-officers-quit-worst-job-world-join-NYPD.html.

*of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF). The lawsuit alleged that the City, through its correction officers on Rikers Island, engaged in a pattern and practice of excessive force. The lawsuit sought declaratory and injunctive relief on behalf of those effected by this *de facto* policy.

218.    In 2014, while the *Nunez* litigation was ongoing, former Mayor Bill DeBlasio hosted a roundtable to discuss much-needed reforms to Rikers Island, calling the multi-jail complex a "dehumanizing environment" which creates a "dynamic of conflict and violence" which was "decades in the making."[132]

219.    This round table—one of many public meetings on Rikers that would be held over the next five years—followed a Department of Justice report on the conditions of confinement for adolescent males on Rikers Island (herein after the "DOJ Report"). The DOJ Report, announced on August 4, 2014, concluded that "there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates" and the "investigation suggests that the systemic deficiencies identified in [the] report may exist in equal measure" for adult detained persons housed in separate facilities on the Island.[133]

220.    On October 21, 2015, the District Court entered a Consent Judgment in Nunez "to correct the violations of federal rights as alleged" by the Plaintiff class in that case. The Consent Judgment provided for a federal monitor to report on the DOC's compliance with the agreed-upon reforms for Rikers Island.

---

[132] *See* Office of the Mayor, "Mayor de Blasio Hosts Media Roundtable on Reform at Rikers Island Correctional Facilities," The City of New York (Nov. 20, 2014), https://www1.nyc.gov/office-of-the-mayor/news/932-14/transcript-mayor-de-blasio-hosts-media-roundtable-reform-rikers-island-correctional.

[133] *See* U.S. Department of Justice, "CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island," (Aug. 4 2014), https://www.justice.gov/sites/default/files/usao-dny/legacy/2015/03/25/SDNYpercent20Rikers percent20Report.pdf.

221.    Since the Consent Judgment was entered nearly seven years ago, federal monitor Steve J. Martin has produced at least twelve reports covering the period between October 22, 2015 (beginning the first monitoring period) and June 30, 2021 (ending the twelfth monitoring period); at least four Remedial Reports; and at least seventeen supplementary status reports, recommendations, and action plans associated with conditions on the Island,[134] all of which make clear that the City has not only failed to comply with the terms of the Consent Judgment, but that conditions on Rikers have worsened significantly since the Consent Judgment was entered, reflecting a "pervasive level of disorder and chaos in the facilities" that extends far beyond the staff violence against adolescent males for which the monitor was first required.[135]

222.    The extent of officer-inflicted violence on the incarcerated population is reflected in the experiences of the punitive class members. As staff absenteeism worsens, the guards who remain on the Island are quick to use violent interventions that often escalate, rather than deescalate, incidents between detained persons or simple misunderstandings or arguments between staff and those held on Rikers Island.

223.    With fewer a guards posted in positions that deal directly with the incarcerated population, a small argument or incident often results in harsh responses from DOC staff. The indiscriminate use of pepper spray has become synonymous with the agency's Emergency Services Unit ("ESU"), who are well known by detained persons to use retaliatory and brutal excessive force rather than the minimum force necessary to maintain order and protect the incarcerated population.

---

[134] *Id.*

[135] *See* Steve J. Martin, "Eleventh Monitor's Report: July 1, 2020–December 31, 2020" (May 5, 2021), https://www1.nyc.gov/assets/doc/downloads/pdf/11th_Monitor_Report.pdf.

**H.  The City has neglected Rikers Island in anticipation of closing it down.**

224.    Less than two years after the *Nunez* Consent Judgment, the City announced a $30 million comprehensive plan to close and replace Rikers.[136] City officials claimed that the plan included "immediate steps to expand services and renovate facilities to ensure that those who work and are incarcerated in city jails have safe, humane conditions as quickly as possible."[137]

225.    While the plan made clear that the transition away from Rikers would be lengthy (at the time, the estimated year of completion was 2026), it did not provide a detailed account of how those who remained housed on Rikers Island for the remainder of its operational period would be provided with constitutional standards of care. And in 2015, Mayor de Blasio admitted that he underestimated how dysfunctional Rikers is and how much was required to fix it.[138]

226.    In the months and years that followed the decision to close Rikers, the Island's eight separate jail facilities have fallen into complete disrepair. The problem is so abysmal that the City does not even have the ability to execute and complete routine work orders.[139]

227.    The deteriorating physical conditions lead directly to violence because cell and dormitory doors often do not lock, allowing incarcerated people to be attacked at night and

---

[136] *See* Office of the Mayor, "Mayor de Blasio Announces 'Smaller, Safer, Fairer: A Roadmap to Closing Rikers Island,'" The City of New York (Jun. 22, 2017), https://www1.nyc.gov/office-of-the-mayor/news/427-17/mayor-de-blasio-smaller-safer-fairer--roadmap-closing-rikers-island-

[137] *See* Office of the Mayor, "Mayor DeBlasio Announces 'Smaller, Safe, Fairer: A Roadmap to Closing Rikers Island,'" The City of New York (Jun. 22, 2017),  https://www1.nyc.gov/office-of-the-mayor/news/427-17/mayor-de-blasio-smaller-safer-fairer--roadmap-closing-rikers-island-.

[138] *See* Michael Winerip, "Even as Many Eyes Watch, Brutality at Rikers Island Persists," The New York Times (Feb. 21, 2015) https://www.nytimes.com/2015/02/22/nyregion/even-as-many-eyes-watch-brutality-at-rikers-island-persists.html.

[139] *See* Nicole N. Austin, "Report on Environmental Conditions: *Benjamin v. Brann*, 75 Civ. 3073 (LAP) Progress Report May-August 2021," Office of Compliance Consultants (October 27, 2021) at 30 ("As with the prior monitoring period, a review of the PHS and EHO inspection reports for the current monitoring period indicate numerous references to the lighting not being maintained, and where work orders have been submitted the conditions have remained unabated, necessitating the submission of additional work orders.")

allowing others access to restricted areas of the facilities, diverting staff away from their posts.

228.    Whistleblowers and activists, along with City and State officials, have warned for years that the Island was at a breaking point, long before COVID-19 reached New York. Yet Rikers has so greatly deteriorated that local politicians have pled with Gov. Hochul and President Biden to intervene, even requesting that the federal government send in the National Guard to help restore some semblance of order. Zachary Carter, former NYC Corporation Counsel and former US Attorney for New York's Eastern District, supported the idea of a federal receivership.[140]

229.    In addition to the multitude of requirements imposed by the original *Nunez* consent judgment, most of which continue to be ignored by City officials, District Court Judge Swain recently entered a sweeping order to help alleviate some of the concerns about worsening conditions on the Island.[141] There have been no signs of such implementation thus far.

230.    The City has violated multiple other court orders. For example, the City has not complied with the Environmental Order in *Benjamin* directing the DOC to remedy violations of federal law at Rikers.[142]

231.     In late September 2021, Judge Mitchell J. Danzinger of the Supreme Court, Bronx County, issued a preliminary injunction related to the inhumane conditions in a specific unit inside GRVC called the Enhanced Supervision Housing ("ESH").[143] The unit holds approximately 115 detained persons who the DOC believes pose a threat to themselves or others.

232.    The comprehensive preliminary injunction directed the DOC to provide basic

---

[140] *See* Stephen Handelman, "Reformers Call for Federal Takeover of New Yorks Rikers Jail," Center on Media Crime and Justice at John Jay College (May 20, 2022), https://thecrimereport.org/2022/ 05/20/reformers-call-for-federal-takeover-of-new-yorks-rikers-jail/.
[141] *See Nunez*, 11 cv 5845 at ECF No. 398.
[142] *See Benjamin v. Brann*, No. 75 cv 03073 (S.D.N.Y).
[143] *See Acre et al v. City of New York, et al*, Index No. 809252/2021 (Sup. Ct. Bronx Co. 2021).

standards of living—access to showers and personal care items, bedding, clean blankets, recreational periods, access to attorneys and the courts, and three hot meals a day. The City continues to violate the injunctive order.

233.    At least one other lawsuit was recently brought by local defender organizations on behalf of those detained persons still trapped on the Island, specifically complaining of the lack of medical care accessible to those who need it.[144] The defendants were ordered to provide medical visits to everyone who needed it, but the City violated those orders and was held in contempt.[145]

234.    Either the City has let Rikers Island deteriorate so badly that it cannot comply with court orders, or the City is making a deliberate choice not to correct the problems, choosing contempt of court rather than taking the steps it needs to take.

235.    Either way, these contempt rulings, taken with the numerous admissions by DOC officials and politicians, make the situation undeniable. The City has simply failed, repeatedly and deliberately, to detain people in such a way that conditions meet bare minimum standards required both by the constitution and by simple human decency.

236.    The direct and inevitable result of the City of New York's policies are the multiple deprivations of Mr. Vega's constitutional rights. The driving force behind every horrible condition at Rikers Island is a combination of the failure to properly staff the jails, the failure to train the people working there, and the failure to keep the jails in proper working order. Put simply, the City, in allowing Rikers Island to fall apart, caused Mr. Vega's suffering and constitutional violations. Mr. Vega was deprived of the minimal civilized measure of life's necessities and

---

[144] *Id.*
[145] *See* Graham Raymon, "Bronx judge finds city in contempt for missed medical visits on Rikers Island," New York Daily News (Apr. 18, 2021), https://www.nydailynews.com/new-york/ny-rikers-contempt-order-judge-missed-medical-appointees-20220517-l5furejuw5eo3nshwmgfqyonqa story.html

subjected to unreasonable health and safety risks and physical harm by DOC staff.

237.     As a result, the City of New York is liable for any damages caused, except for punitive damages.

## FOURTH CLAIM FOR RELIEF:
## STATE LAW NEGLIGENCE AGAINST THE INDIVIDUAL DEFENDANTS AND THE CITY OF NEW YORK

238.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

239.     Employees of the City of New York and the DOC created and allowed to continue horrific conditions that deprived detainees and Plaintiff of the minimal civilized measure of life's necessities and subjected them to unreasonable health and safety risks. Plaintiff was furthermore subjected to unreasonable physical harm by DOC employees without just cause.

240.     These employees of the City of New York and DOC were negligent in allowing the aforementioned conditions to be created and persist.

241.     The City of New York is liable for the actions of DOC and its employees through the doctrine of *respondeat superior*.

## FIFTH CLAIM FOR RELIEF:
## ASSAULT AGAINST THE INDIVIDUAL DEFENDANTS AND THE CITY OF NEW YORK

242.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

243.     Individual Defendant Hehl intentionally, willfully and maliciously assaulted Plaintiff in that they had the real or apparent ability to cause imminent harmful and/or offensive bodily contact and intentionally did a violent and/or menacing act which threatened such contact to the Plaintiff, and that such acts caused apprehension of such contact in the Plaintiff.

244.    As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

245.    As a result of the above tortious conduct, Defendant Hehl is liable for punitive damages.

246.    The City of New York is liable for the conduct of Defendant Hehl and any damages they caused under the doctrine of *respondeat superior*.

## SIXTH CLAIM FOR RELIEF:
## BATTERY AGAINST THE INDIVIDUAL DEFENDANTS
## AND THE CITY OF NEW YORK

247.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

248.    Individual Defendant Hehl intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff without his consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

249.    As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

250.    As a result of the above tortious conduct, Defendant Hehl is liable for punitive damages.

251.    The City of New York is liable for the conduct of Defendant Hehl and any damages they caused under the doctrine of *respondeat superior*.

**SEVENTH CLAIM FOR RELIEF:**
**STATE LAW CONSTITUTIONAL VIOLATIONS**
**AGAINST THE INDIVIDUAL DEFENDANDS**
**AND THE CITY OF NEW YORK**

252.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

253.     Such conduct breached the protections guaranteed to Plaintiff by the New York State Constitution, including but not limited to, Article 1, §§ 1 and 6.

254.     These employees of the City of New York and DOC were negligent in allowing the aforementioned conditions to be created and persist.

255.     As a result of the above tortious conduct, Plaintiff was caused to suffer physical and emotional injuries.

256.     The City of New York is liable for the actions of DOC and its employees through the doctrine of *respondeat superior*.

257.     Violations of the state constitution are actionable because under 42 U.S.C. § 1983 there is no *respondeat superior* liability and no punitive damages, and thus the federal claims are not a sufficient replacement for the state constitutional claims.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Individual Defendants, as well as the City of New York:

a.     Compensatory damages;
b.     Punitive damages;
c.     The convening and empaneling of a jury to consider the merits of the claims herein;
d.     Costs and interest and attorney's fees;
e.     Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
June 30, 2023

Rickner PLLC

By:        /s/

Sara Wolkensdorfer

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*

**ATTORNEY'S VERIFICATION**

I, Sara Wolkensdorfer, an attorney duly admitted to practice before the Courts of the State of New York, affirm the following to be true under the penalties of perjury:

      1) I am the attorney of record for the Plaintiff Yamill Vega.

      2) I have read the annexed Verified Complaint and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true. My beliefs, as to those matters therein not stated upon knowledge, are based upon facts, records, and other pertinent information contained in my files.

      3) This verification is made by me because Plaintiff does not reside in the County where I maintain my offices.

Dated: New York, New York
      June 30, 2023

Rickner PLLC

By:      /s/

      Sara Wolkensdorfer

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*